FILED

August 11 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0092

DA 15-0092

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 229

IN THE MATTER OF:

J.O.,

      A Youth in Need of Care.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DN-13-55
Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Tracy Labin Rhodes, Attorney at Law; Missoula, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Brenda K. Elias, Assistant
Attorney General; Helena, Montana

        Kirsten Pabst, Missoula County Attorney, Diane Conner, Deputy
County Attorney; Missoula, Montana

                Submitted on Briefs:  July 1, 2015
                         Decided:  August 11, 2015

Filed:

                             Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1    C.S. appeals from the order of the Montana Fourth Judicial District Court, Missoula County, terminating her parental rights to J.O.  We affirm.

## ISSUES

¶2    We review the following issues:

*1. Did the District Court err when it determined that the Department had made reasonable efforts to provide reunification services?*

*2. Did the District Court abuse its discretion when it terminated C.S.'s parental rights?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    J.O. was born in 2007.  His mother is C.S.  J.O. was removed from C.S.'s care twice as a result of C.S.'s criminal conduct, and C.S.'s parental rights to J.O. were eventually terminated on January 20, 2015.  Both the facts and proceedings related to J.O.'s care and custody and the facts and proceedings related to C.S.'s criminal conduct are relevant to this case, though only the case terminating C.S.'s parental rights is currently before this Court.

C.S.'s Criminal History

¶4    In 2010, C.S. was serving a suspended sentence for issuing bad checks.  When she was discovered in possession of drug paraphernalia and after she tested positive for several drugs, including opiates, methamphetamine, and morphine, the District Court revoked her sentence.  C.S. was committed to the Department of Corrections for five years.  While incarcerated, C.S. was placed at Passages Treatment Center, where she

2

completed drug and alcohol counseling. C.S. was then placed at a pre-release center until October 2011, at which time she was conditionally released.

¶5 On May 3, 2013, C.S. was again discovered in possession of drugs and drug paraphernalia. She had been found passed out in the parking lot of a casino. C.S.'s probation officer authorized a search of C.S.'s person and her car, and police officers discovered methamphetamine, marijuana, and drug paraphernalia.

¶6 As a result, C.S.'s conditional release from her issuing bad checks sentence was terminated at a May 29, 2013 hearing. C.S. was also charged with and convicted of possession of dangerous drugs and possession of drug paraphernalia. On March 4, 2014, she was sentenced to several terms of years set to run concurrently with her issuing bad checks sentence. C.S. was then sent to Passages Assessment and Sanction Center in Billings.

¶7 At Passages, C.S. received a chemical dependency evaluation, and the evaluators recommended that C.S. attend Elkhorn Treatment Center and then a pre-release center. C.S. submitted an application to the Elkhorn program in May 2014. Her application was rejected, however, based on letters that she wrote to the screening committee informing it that she did not need treatment and that she would refuse to cooperate with treatment if admitted. Her referral to pre-release was also rejected. The rejection included a comment that C.S. posed an unacceptable level of risk. Based on her rejection from Elkhorn and pre-release, C.S. was transferred to the Montana Women's Prison in August 2014.

3

Facts Related to the Care and Custody of J.O.

¶8 Throughout C.S.'s incarcerations, the Department of Public Health and Human Services (the Department) worked with C.S. to protect J.O. Following C.S.'s 2010 incarceration, the Department placed J.O. in foster care and then in the care of his paternal aunt, D.H., who lived in Nevada. Following C.S.'s release from custody and after she completed drug and alcohol counseling, the Department reunited J.O. and C.S. After monitoring J.O.'s welfare, continuing to provide services to J.O. and C.S. for several months, and observing C.S.'s compliance with her treatment plan, the Department moved to dismiss its petition to terminate C.S.'s parental rights. The District Court granted the motion on October 17, 2012.

¶9 Following C.S.'s May 3, 2013 arrest and incarceration, the Department resumed working with C.S. and J.O. Initially, the Department and C.S. entered a voluntary protective services agreement. However, when C.S.'s chosen caregivers were no longer able to look after J.O., the Department filed a petition for emergency protective services, temporary legal custody of J.O., and adjudication of J.O. as a youth in need of care.

¶10 Following an intervention conference, C.S. stipulated to adjudication of J.O. as a youth in need of care and to the Department receiving temporary legal custody of J.O. She also stipulated to the Department's plan to return J.O. to D.H.'s care while it retained temporary legal custody. On June 26, 2013, following C.S.'s stipulations, the District Court adjudicated J.O. a youth in need of care and granted the Department temporary legal custody.

¶11 Soon thereafter, the Department placed J.O. with D.H. In D.H.'s care, J.O.'s emotional and physical health began to improve. He received emergency treatment to his teeth, which were seriously decayed, and he began meeting with Jeffrey Davis, a licensed social worker and child and family counselor. Unprompted, J.O. began referring to D.H. and her husband as his mother and father, and he expressed his desire to stay in Nevada and to be adopted by D.H. and her husband. When J.O. was given the opportunity to do so he chose not to communicate via letter or telephone with C.S.

¶12 On August 14, 2013, the District Court approved a treatment plan for C.S., which had been developed by the Department. The plan primarily required C.S. to address her chemical dependency issues and to develop her parenting abilities. C.S. stipulated that the plan was reasonable.

¶13 At some point prior to September 19, 2013, C.S. applied for placement at the Carole Graham Home. The Carole Graham Home is a residential program for substance abusing women and their children. C.S. hoped that her placement there would allow her to be reunited with J.O. However, the Carole Graham Home denied C.S.'s application, writing that "[C.S.] may not be a good fit for our program because [the Department] is not in support of reunification between [C.S.] and [J.O.] at this time."

¶14 On July 2, 2014, after C.S. was convicted of possession of dangerous drugs and drug paraphernalia, the Department petitioned to terminate C.S.'s parental rights. Following a hearing, the District Court granted the petition. It found that C.S. had subjected J.O. to aggravated circumstances and that as a result the Department was not required to make reasonable efforts at providing preservation or reunification services.

Nevertheless, it also decided that the Department had provided reasonable services to C.S. It then decided that termination of C.S.'s parental rights was justified on two grounds. First, it decided to terminate C.S.'s parental rights because she had subjected J.O. to aggravated circumstances. Second, it decided to terminate C.S.'s parental rights based on C.S.'s failure to comply with her treatment plan and its finding that the condition rendering C.S. unfit was unlikely to change in a reasonable time. C.S. appeals.

## STANDARD OF REVIEW

¶15 We review a district court's decision to terminate parental rights for abuse of discretion. *In re L.N.*, 2014 MT 187, ¶ 12, 375 Mont. 480, 329 P.3d 598. We review the court's findings of fact for clear error and its conclusions of law for correctness. *L.N.*, ¶ 12.

## DISCUSSION

¶16 *1. Did the District Court err when it determined that the Department had made reasonable efforts to provide reunification services?*

¶17 C.S. argues that the Department did not provide reasonable reunification services and that the District Court erred when it decided otherwise. She also argues that the District Court erred by deciding that reunification services were not necessary. We hold that the District Court did not err when it decided that the Department provided reasonable reunification services. For this reason, we do not address C.S.'s argument concerning whether reunification services were necessary.

¶18 Section 41-3-423(1), MCA, requires the Department to "make reasonable efforts to prevent the necessity of removal of a child from the child's home and to reunify families that have been separated by the state." It specifies that:

> Reasonable efforts include but are not limited to voluntary protective services agreements, development of individual written case plans specifying state efforts to reunify families, placement in the least disruptive setting possible, provision of services pursuant to a case plan, and periodic review of each case to ensure timely progress toward reunification or permanent placement.

Section 41-3-423(1), MCA, also states that "[i]n determining preservation or reunification services to be provided and in making reasonable efforts at providing preservation or reunification services, the child's health and safety are of paramount concern." In fact, protection of children's health and safety is the primary purpose of Title 41, Chapter 3, MCA. Section 41-3-101(7), MCA.

¶19 Here, the Department provided many preservation and reunification services to J.O. and C.S. before C.S.'s parental rights were ultimately terminated. After J.O. was removed from C.S.'s care in 2010, the Department worked with C.S. to place J.O. with a family member, and it eventually accomplished this goal by placing J.O. with D.H. It also provided a treatment plan for C.S. When C.S. completed that treatment plan, it reunited J.O. and C.S. It then continued to provide C.S. with services and trainings while also monitoring J.O.'s welfare. After several months without incident, it decided that reunification had been successful and dismissed its suit.

¶20 Following C.S.'s arrest and incarceration in 2013, the Department continued to provide reunification and preservation services to C.S. Rather than immediately

7

removing J.O. from C.S.'s care, it entered a voluntary protective services agreement with C.S. Pursuant to that agreement, J.O. was left in the care of C.S.'s housemate and J.O.'s babysitter. Only once these parties could no longer care for J.O. did the Department decide to place J.O. in foster care and then in the care of D.H. It determined that placement with D.H. was the least disruptive setting possible, considering that J.O. had already lived with D.H. during his first removal, that D.H. was a family member, and that C.S. consented to this arrangement. After removing J.O. and placing him in D.H.'s care, the Department worked with C.S. to develop a treatment plan so that she might address her parenting and drug related issues and eventually be reunited with J.O. C.S. agreed to this treatment plan, stipulating that it was reasonable.

¶21 The District Court decided that these services constituted reasonable efforts at providing preservation and reunification services. We agree. As the District Court concluded, the Department entered voluntary protective services agreements, written case plans, and placed J.O. in the least disruptive setting possible. By the plain language of § 41-3-423(1), MCA, reasonable efforts may comprise such actions.

¶22 C.S., however, believes the Department failed to provide reasonable reunification services in two ways. First, she claims that the Department prevented her placement for treatment in the Carole Graham Home. Second, she claims that the Department prevented phone contact between her and J.O. Nevertheless, we hold that the Department made reasonable efforts at providing reunification services.

¶23 C.S. contends that if she was placed in the Carole Graham Home that J.O. could have continued to live with her. She argues, therefore, that the Carole Graham Home

8

would have been the least disruptive placement and that the Department failed to make reasonable reunification efforts by preventing her placement there. According to C.S., the Department prevented her placement at the Carole Graham Home by stating around the time of C.S.'s application that C.S. was not ready for reunification with J.O. Ostensibly the Department's statement was the only thing that prevented C.S.'s placement there.

¶24 Even if we take the foregoing to be true, we do not agree that the Department failed to make reasonable efforts at providing reunification. When C.S. asked for placement with J.O. at the Carole Graham Home, she was not simply asking for reasonable reunification services. Instead, she was asking for J.O. to be placed in her care. She was asking for actual reunification. The Department denied this request because C.S. had not made progress on her treatment plan. Indeed, she had failed to comply with substantial portions of the plan. By failing to comply with the treatment plan, she had failed to satisfy the conditions that C.S., the Department, and the District Court had agreed were necessary for the safe return of J.O. to C.S. *See* §§ 41-3-102(30) and -443(2)(b), MCA. As the health and safety of J.O. was the Department's paramount concern and as C.S. had not demonstrated that J.O. could be safely returned to her care, it was reasonable for the Department to oppose reunification at the time of C.S.'s request. *See* § 41-3-423(1), MCA. The Department did not fail to make reasonable efforts at providing reunification services by opposing C.S.'s placement.

¶25 The Department also did not fail to provide reasonable reunification services when it did not provide phone contact between J.O. and C.S. C.S. argues that the lack of

9

phone contact with J.O. was improper given that her treatment plan required "therapeutic contact" with J.O. However, the Department was not required to provide every conceivable reunification or preservation service to C.S. It was instead required to make *reasonable efforts* at providing reunification services while recognizing that the health and safety of the child are its paramount concerns. Section 41-3-423(1), MCA.

¶26 Here, J.O.'s counselor, Davis, observed that J.O. had nightmares and was unable to focus in school after speaking with his father on the telephone. J.O. also became uncomfortable when discussing his parents or when anyone referred to C.S. as his mother. When given access to letters from his mother, J.O. became uncomfortable and had no interest in reading them. Based on these observations and in the interests of J.O.'s emotional health, Davis recommended that J.O. be given the choice of whether or not to have any phone contact with C.S. Given this choice, J.O. never chose to speak with C.S. on the telephone.

¶27 In light of the concerns Davis identified regarding J.O.'s health and safety, and in light of the other services it did provide, the Department was not required to provide C.S. with phone contact with J.O. in order to make reasonable efforts at providing reunification services. It bears repeating that J.O.'s health and safety were the Department's paramount concerns. The Department did not need to provide reunification services that would put J.O.'s health or safety at risk. *See* § 41-3-423(1), MCA; *In re B.S.*, 2009 MT 98, ¶ 32, 350 Mont. 86, 206 P.3d 565 ("[T]he statutes give priority to the best interests of the child as the primary and paramount statutory standard for termination. . . . The best interests of the child take precedence over parental rights, and

the need for permanent placement in a loving and stable home supersedes the parents' interests.").

¶28 Moreover, even if the Department could have done more to facilitate therapeutic contact between C.S. and J.O., the fact remains that C.S. failed to comply with other tasks in the treatment plan. Phone contact with J.O. was not the only task standing in the way of their reunification. As we concluded above, one of the ways the Department made reasonable efforts to provide reunification services was by entering written case plans, including a treatment plan, with C.S. Compliance with her treatment plan was ultimately C.S.'s responsibility. *See In re L.W.K.*, 236 Mont. 14, 19, 767 P.2d 1338, 1342 (1989).

¶29 We hold that the District Court did not err when it decided that the Department made reasonable efforts to provide reunification services. For this reason, we do not address C.S.'s additional argument regarding the District Court's decision that reunification services need not be provided.

¶30 *2. Did the District Court abuse its discretion when it terminated C.S.'s parental rights?*

¶31 The District Court found that the grounds for termination identified in §§ 41-3-609(1)(d) and -609(1)(f), MCA, were met, and it terminated C.S.'s parental rights to J.O. for this reason. C.S. argues that several findings of fact justifying this decision were not supported by substantial evidence and were, therefore, clearly erroneous. We disagree. We hold that substantial evidence supports the District Court's findings that § 41-3-609(1)(f), MCA, had been satisfied. As this statute and these findings provided an independently sufficient basis for the District Court to terminate

11

C.S.'s parental rights, we do not consider C.S.'s arguments concerning § 41-3-609(1)(d), MCA. *In re I.T.*, 2015 MT 43, ¶ 16, 378 Mont. 239, 343 P.3d 1192; *In re S.T.*, 2008 MT 19, ¶ 15, 341 Mont. 176, 176 P.3d 1054; *see* § 41-3-609(1), MCA.

¶32 According to § 41-3-609(1)(f), MCA, a court:

> may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence . . . that . . . the child is an adjudicated youth in need of care and both of the following exist: (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

When making this determination, "the court shall consider but is not limited to the following: . . . (c) excessive use of . . . a narcotic or dangerous drug that affects the parent's ability to care and provide for the child; and (d) present judicially ordered long-term confinement of the parent." Section 41-3-609(2), MCA.

¶33 C.S. does not dispute that J.O. is an adjudicated youth in need of care or that either she has not complied with her court-approved treatment plan or the treatment plan has been unsuccessful. Instead, she only argues that there was not substantial evidence to support the District Court's finding that the conduct or condition rendering her unfit was unlikely to change within a reasonable time.

¶34 In *In re C.B.*, 2014 MT 4, 373 Mont. 204, 316 P.3d 177, we affirmed a district court's decision that a mother's drug problems rendered her unfit and were unlikely to change within a reasonable time. *C.B.*, ¶¶ 22-23. We reasoned that the drug problems had existed for over twelve years and that the mother had failed to address them, and had

even affirmatively resisted addressing them, despite being presented with the opportunity to do so. *C.B.*, ¶ 22.

¶35 Similarly, C.S. has drug problems that have persisted for years and that she has failed to address despite opportunities to receive treatment. As the District Court noted, C.S. was found in possession of dangerous drugs, including morphine and methamphetamine, in 2010 and 2013. Both incidents led to her arrest and incarceration, and between 2013 and the time the District Court terminated C.S.'s parental rights she was continuously incarcerated. During this time, C.S. was given the opportunity to address her drug problems. Yet, she sabotaged every treatment opportunity by stating in her letters to the treatment program screening committees that she did not need treatment and would refuse to cooperate with treatment programs. Based on these facts and their similarities with *In re C.B.*, there was substantial evidence for the District Court to find that C.S.'s excessive use of a dangerous drug and her long term confinement—the conditions rendering her unfit—were unlikely to change in a reasonable time.

¶36 Thus, the District Court's finding that the conditions rendering C.S. unfit were unlikely to change was not clearly erroneous. Based on this finding and the District Court's uncontested findings, the District Court was authorized by § 41-3-609(1)(f), MCA, to terminate C.S.'s parental rights. As it complied with this statute, it did not abuse its discretion by terminating C.S.'s parental rights. *See In re J.C.*, 2003 MT 369, ¶ 18, 319 Mont. 112, 82 P.3d 900.

**CONCLUSION**

¶37     The District Court decided that the Department made reasonable efforts to provide C.S. with reunification services. This finding was not clearly erroneous. The District Court terminated C.S.'s parental rights based on the authority of § 41-3-609(1)(f), MCA. We disagree with C.S.'s argument that one of the findings upon which this decision was based—that the condition rendering C.S. unfit was unlikely to change within a reasonable time—was not supported by substantial evidence. C.S. made arguments to this Court that we do not address because our decisions on the arguments that we do address provide a sufficient basis upon which to affirm the District Court's decision. We affirm.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON
/S/ BETH BAKER